1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT
9                        SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| ANGIE FERNANDEZ-LAWSON an individual, and TRENTON KEPPLE, an individual, | Case No.:  23CV777-GPC(AHG) |
| | **ORDER** |
| Plaintiffs, | **(1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT; AND** |
| v. | |
| NATIONAL GENERAL INSURANCE COMPANY; and DOES 1 through 10, | **(2) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Defendant. | |
| | **[Dkt. Nos. 18, 19.]** |

        Before the Court are Plaintiffs and Defendant's motions for partial summary

judgment.  (Dkt. Nos. 18, 19.)  Oppositions and replies were filed.  (Dkt. Nos. 24-27.)

The Court finds that the matter is appropriate for decision without oral argument pursuant

to Local Civ. R. 7.1(d)(1).  After a careful review of the papers, the supporting

documentation, and the applicable law, the Court GRANTS in part and DENIES in part

Plaintiffs' motion for partial summary judgment; and GRANTS in part and DENIES in

part Defendant's motion for summary judgment.

**Procedural Background**

On April 27, 2023, Plaintiffs Angie Fernandez-Lawson ("Fernandez-Lawson") and Trenton Kepple ("Kepple") (collectively "Plaintiffs") filed an insurance bad faith complaint against Defendant National General Insurance Company ("NGIC" or "Defendant") arising from injuries Fernandez-Lawson sustained from a car accident on October 11, 2017 when she was struck from behind by Kepple.  (Dkt. No. 1, Compl.) The complaint alleges the following six causes of action: 1) by Fernandez-Lawson, as assignee, for breach of the implied covenant of good faith and fair dealing; 2) by Fernandez-Lawson, as assignee, for breach of contract; 3) by Fernandez-Lawson, as judgment creditor, for direct action for recovery of judgment under California Insurance Code section 11580; 4) by Fernandez-Lawson, as judgment creditor, for breach of the implied covenant of good faith and fair dealing; 5) by Fernandez-Lawson, as judgment creditor, for breach of contract; and 6) by Kepple, as an individual, for breach of the implied covenant of good faith and fair dealing.  (*Id.* ¶¶ 52-82.)

On March 18, 2024, Plaintiffs and Defendant filed their respective motions for partial summary judgment.  (Dkt. Nos. 18, 19.)  Plaintiffs seek summary judgment on the three claims for breach of the implied covenant of good faith and fair dealing brought by Fernandez-Lawson, as assignee (first claim), and judgment creditor (fourth claim), and by Kepple, as an individual (sixth claim).  (Dkt. No. 18.)  Defendant pursues summary judgment on the same three claims for breach of the implied covenant of good faith and fair dealing (first, fourth and sixth claims); the two breach of contract claims brought by Fernandez-Lawson, as assignee (second claim), and as judgment creditor (fifth claim); the third claim for direct action for recovery of judgment by Fernandez-Lawson, as judgment creditor; and the claim for punitive damages.  (Dkt. No. 19.)  Oppositions and replies were filed.  (Dkt. Nos. 24, 25, 26, 27.)

**Factual Background**

NGIC issued automobile insurance policy number 2004671415 to Ray Kepple who listed Plaintiff Trenton Kepple as an additional insured providing limits of $15,000 for

bodily injury per person.  (Dkt. No. 19-4, Tuck Decl., Ex. 1.)  The insurance policy provides, "[NGIC] will pay damages for 'bodily injury' . . . for which an 'insured' becomes legally responsible because of an auto accident. Damages include prejudgment interest award against the 'insured'. We will settle or defend, as we consider appropriate, any claim or suit asking for these damages. In addition to our limit of liability, we will pay all defense costs we incur. Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted."  (*Id*. at 10.[1])

A.     **Accident and Initial Claim Handling**

On October 11, 2017, Fernandez-Lawson was stopped at a red light when she was struck from behind by Kepple.  (Dkt. No. 24-2, Pls' Response to D's SSUMF, No. 2.) NGIC's claim file[2] indicates that on that same day, Reginald Lawson, Fernandez-Lawson's husband who was also a passenger, contacted NGIC about the accident.  (Dkt. No. 19-4, Tuck Decl., Ex. 2 at 140.)  On October 12, 2017, Reginald Lawson reported to NGIC that they were rear-ended by the insured while stopped at a red light, that Fernandez-Lawson was the driver and was taken, by ambulance, to a hospital and released that day with neck and back issues.  (*Id*. at 138.)  On October 13, 2017, NGIC concluded that the accident was covered by the insurance policy which provided bodily injury limits of $15,000 per person, that the insured was 100% at fault and Fernandez-Lawson was taken to the "ER via EMS for soft tissue."  (*Id*. at 137.)  After review of pictures submitted of the accident, NGIC wrote there was "moderate damage to the hatch

---

[1] Page numbers are based on the CM/ECF pagination.
[2] A claim file includes "[d]ocuments, correspondence, memos, policy information, estimates, photographs, and other information" to evaluate a claim and is generated and maintained by claim specialists and supervisors.  (Dkt. No. 19-3, Tuck Decl. ¶¶ 4-5.)  Claim specialists and supervisors are trained and instructed to write down any significant information, or memorialize a pertinent conversation or event, and include what the claim specialist or supervisor has done, heard or observed and entries are made at or near the time of the activity related in each entry.  (*Id*.)  The Court notes NGIC's claim file includes a lot of insurance jargon and abbreviations not fully explained by either party.  While some abbreviations, jargons and abbreviated words are decipherable, others are not.  The Court did its best to decipher the language in the claim file and disregarded those it did not understand.

door dented and creased on both sides indicating a center r/e hit.  The paint on the rear bumper appears to be chipping off from the plastic being flexed, or possibly from the age of the vehicle.  There appears to be some dmg to the right front bumper, fender, headlight & fender." (*Id.*)

On October 13, 2017, Fernandez-Lawson spoke with a representative of NGIC stating that she was taken to urgent care at Grossmont Hospital, no x-ray or CT scans were taken, after checking her neck and spine, she received a shot for the pain in her shoulder and a pill.  (*Id.* at 136.)  She was diagnosed with muscular skeletal pain, "cervical s/s", and she felt like her left eyeball was going to pop.  (*Id.*)  The emergency room ("ER") doctor advised she follow up with her primary care physician ("PCP") and was prescribed ibuprofen and "cyclobenzaprine OOP".  (*Id.*)  She paid $100 to ER and $5 for the prescription.  (*Id.*)  Fernandez-Lawson was told there is a $30 copay to see her doctor and because she did not have any money at the time, she indicated she would wait to schedule the appointment.  (*Id.*)  As to lost wages, Fernandez-Lawson informed the NGIC representative that she is self-employed as a dog groomer but could not stand because her left arm was tweaked and she had back pains.  (*Id.*)  Fernandez-Lawson also explained to NGIC that she worked on about 2-6 dogs per day, though it varied, with fees ranging from $25 (for nail trim) to $75-$100 (bath and clip), that she did not have any appointments scheduled for the day of the accident but claimed she had missed three appointments as of October 13, 2017 and lost $200 in wages.  (*Id.*)  The representative offered her "$1,000 gens, $200 lost income plus meds up to $3,500" but she declined and stated she was still in pain and wanted to see her doctor first because she felt a lot of force from the impact.  (*Id.*)  She acknowledged she never heard screeching tires but felt a moderate force of impact.  (*Id.*)

In a letter dated October 26, 2017, Fernandez-Lawson's counsel, Bibianne Fell ("Attorney Fell"), of Gomez Trial Attorneys, informed NGIC that she represented Fernandez-Lawson concerning the October 11, 2017 accident, made a formal demand for the preservation of evidence, requested all insurance policies, including the declaration

pages which listed the policy limits, and asked NGIC to request its insured's permission to release that information as authorized by California law.  (Dkt. No. 18-5, Calhoon Decl., Ex. 8.)  Fernandez-Lawson's claim was handled by claims adjuster, Starla Tuck, who handled claims in several states, including California, and had authority to settle up to $15,000 without any additional managerial oversight.  (Dkt. No. 25-1, D's Response to Pls' SSUMF, No. 9.)

**B.     First Policy Limits Demand Dated February 9, 2018**

On February 15, 2018, NGIC received a call as well as the first policy limits demand, dated February 9, 2018, from Attorney Fell indicating that the settlement offer for the policy limits would remain open until February 23, 2018.  (Dkt. No. 19-3, Tuck Decl. ¶ 12; Dkt. No. 18-5, Calhoon Decl., Ex. 13.)  The letter was seven pages long and included pictures of the damaged vehicle discussing Kepple's full liability, explained Fernandez-Lawson's medical treatment and her continued severe pain on the left side of her head, neck and radiating down her arm as well as severe burning-type pain radiating into her buttock.  (Dkt. No. 18-5, Calhoon Decl., Ex. 13 at 69.)  The letter included pictures of Fernandez-Lawson and her dog-grooming business showing her work involves bending, stooping, standing and heavy-lifting.  (*Id.* at 72.)  Included also was a table of medical expenses showing $4.658.16 for American Medical Response ("AMR") for the ambulance, $715.00 for Team Phys. of Northern CA Med. Group, Inc., unknown costs for Sharp Premiere as well as Sharp Grossmont Hospital, and $200 in co-pays for a total of $5,573.16.  (*Id.* at 70.)  The letter further explained that Fernandez-Lawson had not been able to work as a dog groomer during the past four months since the accident because she could not stand for more than five minutes.  (*Id.*)  It included a table showing she made on average of $2,800 per month between June 2017 through August 2017, and on average $1,600.00 per month in September and October 2017.  (*Id.* at 71.)  Based on this, the table showed losses of $1,200 in October 2017 and $2,800 from November through February 2018 for a total of $12,400.  (*Id.*)

23CV777-GPC(AHG)

Attached to the first policy limits demand letter were medical records for the October 11, 2017 emergency room visit to Sharp Grossmont Hospital; a October 20, 2017 office visit with Dr. Merritt Matthews, M.D.; three x-ray reports of Fernandez-Lawson's left shoulder, cervical spine and lumbar spine dated October 25, 2017; a November 6, 2017 office visit; an invoice from American Medical Response ("AMR"), the ambulance, for $4,658.16[3]; and a receipt for a copay for the October 20, 2017 appointment but with no dollar amount indicated.  (Dkt. No. 18-5, Calhoon Decl., Ex. 13.)

The ER notes of October 11, 2017, the day of the accident, indicated that Fernandez-Lawson complained of lateral left neck pain that radiates down the left arm, left lower back pain and left buttock pain radiating down her left leg and describing her pain as an 8/10 constant "heat type" pain.  (*Id.* at 76.)  Pain is aggravated with movement and Fernandez-Lawson also had some tingling sensation to the left foot, in her fingers and a mild headache.  (*Id.*)  She was given Toradol and Flexeril.  (*Id.* at 77.)  Her condition improved prior to discharge and it was recommended she follow-up with her primary care physician in 2-3 days for re-evaluation and she was informed that she may need physical therapy in the near future to help with her aches and pains.  (*Id.*)  The notes also stated that there are no "red flags to warrant admission for emergent MRI; patient is deemed stable for outpatient management."  (*Id.* at 78.)  The Impression listed was headache, neck pain, left lower back pain and left leg pain.  (*Id.*)  On discharge, she was prescribed Flexeril for pain management and a prescription for ibuprofen.  (*Id.*)

On October 20, 2018, nine days after the accident, Fernandez-Lawson saw her PCP, Dr. Merritt Matthews ("Dr. Matthews"), who assessed her with cervical strain,

---

[3] The Court notes that the NGIC claim file incorrectly lists the AMR ambulance bill as $4,568.16 instead of $4,658.16, the actual invoice amount.  It appears that Attorney Fell wrote the incorrect amount in her demand letter although the invoice, with the amount of $4,658.16, was attached.  (Dkt. No. 18-5, Calhoon Decl., Ex. 13 at 70.)  Despite the typographical error, the Court relies on the actual amount of $4,658.16 in its analysis.

23CV777-GPC(AHG)

acute; lumbar strain; strain of left shoulder and grade 1 concussion with no loss of consciousness.  (*Id.* at 80.)  Her chief complaint was neck/lower back pain and left shoulder pain.  (*Id.*)  On physical examination, Dr. Matthews noted reduced range of head and neck particularly decreased range of motion of the neck in left rotation and flexion.  (*Id.* at 81.)  He prescribed x-rays, and on October 25, 2018, x-rays were conducted of her shoulder, lumbar and cervical spine.  (*Id.* at 82-94.)  The shoulder x-ray revealed no fracture or abnormality of the left shoulder; the lumbar x-ray showed mild degenerative disc disease at the lumbosacral junction and minimal scoliosis; and the cervical spine x-ray revealed mild degenerative disc disease at C3-4.  (*Id.* at 82-84.)  On her follow up visit, on November 6, 2017, Dr. Matthews diagnosed her with whiplash injury to neck; lumbar strain; degenerative joint disease of cervical and lumbar spine; and cervical strain.  (*Id.* at 85.)  On this visit, she complained of left and mid-occipital pain and tingling/numbness to the occipital scalp.  (*Id.*)  He referred her to physical therapy for whiplash and low back with a follow up in two months.  (*Id.*)

Upon Tuck's preliminary review on February 15, 2018, the claim file recited the medical records from the ER notes which corroborated the report from Fernandez-Lawson.  (Dkt. No. 19-4, Tuck Decl., Ex. 2 at 118-19.)  The claim file also included "aggravators" and "mitigators."  (*Id.* at 119.)  "Aggravators" listed were clear liability, moderate impact, complaints of neck pain that radiates down left arm, back pain, left buttock pain that radiates down her left leg, and struck head on headrest.  (*Id.*)  "Mitigators" included soft tissue injuries, no fractures/dislocations, negative x-rays, mild degenerative disc disease at the lumbar and cervical spine and only four days of treatment records.  (*Id.*)  Next step was to call the attorney if there are additional medical records as there was only 4 days of treatment and wage loss documentation.  (*Id.*)  Tuck wrote "Proactive follow ups" and "Continue to move claim toward a resolution."  (*Id.*)

On the same day, February 15, 2018, Tuck left a message with Attorney Fell's office seeking additional medical bills.  (*Id.* at 118.)  Not having heard from Attorney Fell, on February 21, 2018, Tuck evaluated the claim based on the February 9, 2018 first

policy limits demand.  (*Id*. at 116-17.)  She accepted the $4,658.16 for AMR but did not accept the wage loss claim as there was no documentation.  (*Id*. at 117.)  She evaluated the value of the claim to be between $5,795.00, "generals range,"[4] to $10,453.16, the "full value range."[5]  (*Id*. at 117.)  Tuck left a voicemail and sent a letter to Attorney Fell advising that NGIC had reviewed Fernandez-Lawson's medical records and offered to settle the claim for $7,570.00.  (Dkt. No. 19-4, Tuck Decl., Ex. 2 at 116; Dkt. No. 18-5, Calhoon Decl., Ex. 15.)  In the letter, NGIC requested Fernandez-Lawson's counsel contact them so they could discuss the matter further.  (Dkt. No. 18-5, Calhoon Decl., Ex. 15.)

On March 5, 2018, Tuck returned a call she received from Attorney Fell on the same day and left a voicemail.  (Dkt. No. 19-4, Tuck Decl., Ex. 2 at 116.)  On March 6, 2018, Tuck followed up again about the offer with Attorney Fell and left a message with her assistant.  (*Id.* at 115-16.)  On March 20, 2018, Attorney Fell returned the call and she and Tuck discussed the issues.  (*Id.* at 115.)  When Attorney Fell asked Tuck to disclose the policy limits, Tuck advised that she did not have consent.  (Dkt. No. 19-4, Tuck Decl., Ex. 2 at 115; Dkt. No. 18-3, Fell Decl. ¶ 6.)  Without knowing the policy limits, Attorney Fell explained that Fernandez-Lawson was continuing to experience radiculopathy in her upper and lower extremities and was in a significant amount of pain which has been ongoing since the accident.  (Dkt. No. 18-3, Fell Decl. ¶ 6.)  She told Tuck she strongly believed that Fernandez-Lawson suffered an injury to the discs in her spine and additional care, starting with physical therapy, would be required.  (*Id.*)

---

[4] In their briefs, neither party has defined or explained "generals range" but the Court gleans that "generals" means "general damages" which is also known as pain and suffering.  (Dkt. No. 24-3, Calhoon Decl., Ex. 57, Tuck Depo. at 77:15-17.)

[5] Bradley Gibbs, NGIC's regional claims manager, testified that "full value range" is the high end of a settlement range.  (Dkt. No. 25-5, Martin Decl., Ex. 29, Gibbs Depo. at 135:4-13.)  However, Plaintiffs disagree maintaining that the full value range was not a settlement range but the potential judgment Kepple was exposed because the full range is simply the sum of the accepted medical special damages plus NGIC's assessment of the full value of the general damages.  (Dkt. No. 27 at 4-5.)  While this fact is disputed, ultimately, this contention is neither relevant nor dispositive of the Court's ultimate ruling.

Attorney Fell also informed Tuck that an MRI would be needed to identify the cause of the symptoms.  (*Id.*)  Attorney Fell further explained that Fernandez-Lawson needed more treatment but could not afford the copays since she was not working and Attorney Fell did not want to send her for more treatment if it would exhaust the limits.  (*Id.*; Dkt. No. 19-4, Tuck Decl., Ex. 2 at 115.)  Attorney Fell informed Tuck that MRIs cost several thousand dollars and if the case did not settle she would have to resort to lien treatment and unnecessarily erode any settlement funds needed to pay for treatment.  (Dkt. No. 18-3, Fell Decl. ¶ 6.)  Tuck advised counsel that if NGIC had documentation to support the full amount of wage loss, there may be a limits issue.  (Dkt. No. 19-4, Tuck Decl., Ex. 2 at 115; Dkt. No. 18-3, Fell Decl. ¶ 7.)  When Attorney Fell asked what would be needed to accept the wage loss claim, Tuck asked for three years of prior tax returns.  (Dkt. No. 18-3, Fell Decl. ¶ 7; Dkt. No. 19-4, Tuck Decl., Ex. 2 at 115.)  In her notes, Tuck wrote it appears that Fernandez-Lawson plans to seek additional treatment.  (Dkt. No. 19-4, Tuck Decl., Ex. 2 at 115.)

## C.   Second Policy Limits Demand Dated April 4, 2018

In a letter dated April 4, 2018, Attorney Fell sent a second policy limits demand with forty-eight (48) pages of additional medical and billing records to NGIC with a deadline to respond by April 12, 2018.[6]  (*Id.* at 114; Dkt. No. 18-5, Calhoon Decl., Ex. 19; Dkt. No. 18-3, Fell Decl. ¶ 9.)  The second policy limits demand included six CVS pharmacy receipts (ranging from $3.76 to $20 and totaling $68.22 but they did not identify what the amounts were for and some did not have the dates of purchase), an emergency room bill for $2,064.90, and $30-$40 co-payments totaling $210.  (Dkt. No. 18-5, Calhoon Decl., Ex. 19; Dkt. No. 19-4, Tuck Decl., Ex. 2 at 113-14.)  It also included an order by Dr. Matthews for a CT scan of the brain with/without contrast dated

---

[6] The submission also included duplicative x-ray reports taken October 25, 2017, the November 6, 2017 follow up visit with Dr. Matthews as well as the AMR invoice that had already been submitted with the first policy limits demand. (Dkt. No. 18-5, Calhoon Decl., Ex. 19 at 184-86; 202-05.)

March 26, 2018 for chronic headaches.  (Dkt. No. 18-5, Calhoon Decl., Ex. 19 at 182.)
The second policy limits demand also attached two separate physical therapy
assessments, on March 22, 2018, evaluating the lumbar spine and sacroiliac, and
cervical/thoracic spine.  (*Id.* at 187-94.)

On April 6, 2018, after review of the additional documentation, in addition to what
was evaluated before, Tuck added the PT evaluations as a "mitigator" stating that
Fernandez-Lawson started PT five months after the accident and the treatment began
after the initial offer was made indicating three visits began in March 2018.  (Dkt. No.
19-4, Tuck Decl., Ex. 2 at 113.)  Tuck also accepted the additional medical bills and
increased the amount of damages supported by the ER invoice and the co-pays for a total
of $6,843.06.  (*Id.*)  As to wage loss, Tuck noted that no documentation had been
provided to support the $12,400 but recognized that she lost $200 for missing 3
appointments.  (*Id.*)  After review, Tuck revised the value of the claim from $6,795.00,
"generals range" up to $13,638.06, the "full value range."  (*Id.*)  On the same day, Tuck
sent a response indicating she has been trying to contact them about Fernandez-Lawson,
reviewed the additional medical records and offered $9,900.00 to settle the case and
asked counsel call to discuss it further.  (Dkt. No. 18-5, Calhoon Decl., Ex. 21; Dkt. No.
19-4, Tuck Decl., Ex. 2 at 113; Dkt. No. 18-3, Fell Decl. ¶ 10; Dkt. No. 19-3, Tuck Decl.
¶ 19.)

Within a day of NGIC's response, Attorney Fell called Tuck asking why the policy
limits demand was rejected because while she did not know the policy limit, she gathered
it was small.  (Dkt. No. 18-3, Fell Decl. ¶ 11.)  In response, Tuck stated she needed the
tax returns for the prior three years to analyze the wage loss portion.  (*Id.*)  Attorney Fell
told Tuck that the records had been requested and would be sending them soon.  (*Id.*)

**D.    Third Policy Limits Demand Dated April 9, 2018**

On April 9, 2018, Attorney Fell sent a third policy limits demand to NGIC
providing Fernandez-Lawson's tax returns from 2014-2016 to support of her wage loss,
reiterated that Fernandez-Lawson continues to have severe low back pain, continues to

1    treat and continues to be unable to work resulting in significant lost income, and

2    demanded policy limits with an expiration date of April 13, 2018.  (Dkt. No. 18-6,

3    Calhoon Decl., Ex. 24.)  Attorney Fell also informed that Fernandez-Lawson has had

4    financial difficulty paying her copays due to the lost income.  (*Id.*)  The attached tax

5    returns showed that in 2014, Fernandez-Lawson's grooming business grossed

6    $17,425.00; in 2015, it grossed $11,525.00; and in 2016, it grossed $9,355.00.  (*Id.*)

7        On April 11, 2018, Tuck indicated she received additional records and evaluated

8    them.  (Dkt. No. 19-4, Tuck Decl., Ex. 2 at 112.)  Tuck noted that Fernandez-Lawson had

9    more physical therapy visits in March and April 2018, with the last reported visit on April

10    3, 2018.  (*Id.*)  She noted that the PT records were "highly inconsistent" as to Fernandez-

11    Lawson's reports on the location of her position of comfort and "would routinely

12    change[s] answers."  (*Id.*)  Tuck stated that Fernandez-Lawson reported "lingering

13    headaches, occasional blurred vision and light sensitivity, occasional mild confusion and

14    sleep disturbance."  (*Id.*)  She had an eye appointment on February 13, 2018 but no

15    record was provided.  (*Id.*)  The total medical bills accepted remained the same at

16    $6,843.06, the wage loss claim of $12,400 was not accepted because no documentation

17    was provided although the claim file acknowledges lost income of $200 for missing three

18    dog grooming appointments.  (*Id.*)  Based on this, Tuck updated the value of the claim

19    due to "lingering issues" from $7,753.00, "generals range" up to $14,596.06, the "full

20    value range", and offered $11,800.00 and invited counsel to discuss the claim further.

21    (*Id.*; Dkt. No. 18-6, Calhoon Decl., Ex. 25.)

22        In a letter dated April 12, 2018, Attorney Fell rejected the $11,800.00 counteroffer

23    to settle explaining that Fernandez-Lawson's injuries exceed the offer as she cannot work

24    due to radicular symptoms and pain, and she is constrained from seeking medical

25    treatment for financial reasons.  (Dkt. No. 18-6, Calhoon Decl., Ex. 27; Dkt. No. 19-4,

26    Tuck Decl., Ex. 2 at 111.)  Attorney Fell indicated Fernandez-Lawson will proceed with

27    litigation "unhindered" by the insured's policy limits.  (Dkt. No. 18-6, Calhoon Decl., Ex.

28    27.)

**E.      Post-Policy Limits Demand Medical Care**

On May 1, 2018, Fernandez-Lawson saw Dr. Sanjay Ghosh, M.D., a board certified neurosurgeon, who ordered x-rays and MRIs of the cervical and lumbar spine costing $5,850.00.  (Dkt. No. 18-6, Calhoon Decl., Ex. 32.)  She also underwent an epidural injection on June 19, 2018.  (*Id*., Ex. 33.)  On August 28, 2018, Fernandez-Lawson underwent an anterior cervical discectomy with anthrodesis at C5-6, and an anterior cervical discectomy with anthrodesis at C6-7.  (*Id.,* Ex. 35.)  On April 8, 2019, she underwent surgery for diagnostic hip anthroscopy, synovectomy, acetabulosplasty, labral repair, Psoas tendon lengthening, femoraplasty, and capsulorrhaphy.  (*Id*., Ex. 36.)  On May 22, 2019, she underwent additional surgery on the L5-S1 area of her spine, including spinal fixation.  (*Id.*, Ex. 37.)  She also underwent right carpal tunnel release.  (Dkt. No. 19-4, Tuck Decl., Ex. 15.)

**F.      Underlying State Court Action by Fernandez-Lawson against Kepple**

On May 31, 2018, Fernandez- Lawson filed a complaint against Kepple in San Diego Superior Court, Case No. 37-2018-00026790, for bodily injury due to negligence.  (Dkt. No. 24-2, Pls' Response to D's SSUMF, No. 39.)  On June 26, 2018, NGIC was advised Kepple was served with the complaint.  (*Id.*, No. 40.)  On the same day, NGIC offered to settle for Kepple's policy limits of $15,000 "after review [of Fenandez-Lawson's] medical records."  (Dkt. No. 18-6, Calhoon Decl., Ex. 38.)  On July 3, 2018, Fernandez- Lawson rejected NGIC's offer to settle for policy limits.  (*Id.*, Ex. 39.)

NGIC retained counsel to defend Kepple in the litigation filed by Fernandez-Lawson.  (Dkt. No. 24-2, Pls' Response to D's SSUMF, No. 44.)  On July 13, 2020, Kepple assigned his rights against NGIC to Fernandez-Lawson in exchange for not being sued by Fernandez-Lawson in seeking satisfaction of any judgment against him.  (Dkt. No. 19-4, Martin Decl., Ex. 19.)  In April 2022, the case was tried and the verdict was in favor of Fernandez-Lawson.  (Dkt. No. 19-3, Tuck Decl. ¶ 30.)  In May 2022, NGIC issued payment of $15,000 to Fernandez-Lawson for the policy limits toward the judgment.  (*Id.*)  On June 13, 2022, judgment was entered in favor of Fernandez-Lawson

in the amount of $1.5 million against Kepple.  (*Id.*, No. 49.)  Later, on December 20, 2022, an amended judgment was filed to include costs in the amount of $814,054 for a final judgment of $2,314,054.  (Dkt. No. 18-6, Calhoon Decl., Ex. 56; Dkt. No. 19-4, Martin Decl., Ex. 22.)

### Discussion

**A.    Legal Standard on Motion for Summary Judgment**

Federal Rule of Civil Procedure ("Rule") 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986).  Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material when it affects the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact.  *Celotex Corp.,* 477 U.S. at 323.  The moving party can satisfy its burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  *Id.* at 322–23.  Summary judgment is warranted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 323. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress &*

23CV777-GPC(AHG)

*Co.*, 398 U.S. 144, 159-60 (1970).  A "party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc*., 690 F.2d 1235, 1238 (9th Cir. 1982) (citations omitted).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324.  If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law.  *Id.* at 325.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Cor*p., 475 U.S. 574, 587 (1986).  In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin,* 262 F.3d 871, 876 (9th Cir. 2001).  The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact.  *Anderson*, 477 U.S. at 255.

## B.  Breach of the Implied Covenant of Good Faith and Fair Dealing-First, Fourth and Sixth Claims

Defendant seeks summary judgment on the first, (Fernandez-Lawson as assignee), fourth, (Fernandez-Lawson as judgment creditor), and sixth, (Kepple, as an individual)[7], claims for breach of the implied covenant of good faith and fair dealing arguing there are no triable issues of facts showing that its conduct in evaluating the pre-litigation

---

[7] The Court assumes that Kepple's claim is based on his unassignable claim for punitive damages, *see Murphy v. Allstate Ins.* Co., 17 Cal. 3d 937, 942 (1976) (tort damages for emotional distress and punitive damages are not assignable as they are purely personal tort claims), because Kepple assigned his rights to seek damages against NGIC for, among others, failure to settle and failure to investigate, to Fernandez-Lawson.  (Dkt. No. 19-4, Martin Decl., Ex. 19.)

14

settlement demand was reasonable and is not liable for amounts exceeding the policy limits.  (Dkt. No. 19.)  Conversely, Plaintiffs move for summary judgment claiming NGIC breached the covenant of good faith and fair dealing when it failed to accept Fernandez-Lawson's repeated attempts to settle for the $15,000 policy limits and is liable for the full judgment imposed against Kepple in the state court action for negligence.[8] (Dkt. No. 18-1.)

Because this case is in federal court on the basis of diversity of citizenship, 28 U.S.C. § 1332, California law applies.  *See Gibbs v. State Farm Mut. Ins. Co*., 544 F.2d 423, 426 (9th Cir. 1976) (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938)).  As a threshold matter, neither party addresses the legal bases for Fernandez-Lawson to pursue her claims for breach of implied covenant of good faith and fair dealing as an assignee and as judgment creditor but instead conflates them.  Caselaw on the breach of the implied covenant of good faith and fair dealing makes it apparent that actions for damages "in excess of the policy limits based on an insurer's failure to settle is assignable" regardless whether assignments are permitted by the policy.  *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal. 2d 654, 661 (1958); *Johansen v. Cal. State Auto. Ass'n Inter-Ins. Bureau*, 15 Cal. 3d 9, 14 (1975) (claim for failure to accept a reasonable settlement offer within policy limits is assignable and court's inquiry should focus on the relationship between the insurer and the insured); *Hamilton v. Maryland Casualty Co*., 27 Cal. 4th 718, 725, 732 (2002) (insured, to protect himself from an excess judgment,

---

[8] In their motion, Plaintiffs do not specifically articulate which causes of action they are seeking summary judgment on; rather they argue the "bad faith" claims should be dismissed. (Dkt. No. 18-1.) Presumably, they seek summary judgment on the first, fourth and sixth claims.  Moreover, in seeking summary judgment Plaintiffs rely on Judicial Council of California Jury Instruction No. 2334 (Refusal to Accept Reasonable Settlement Demand Within Liability Policy Limits-Essential Factual Elements) as the legal standard governing the breach of the covenant of good faith and fair dealing claims.  (Dkt. No. 18-1 at 17-18.)  But, jury instructions cannot be used as legal authority or to establish legal propositions. *See People v. Morales***,** 25 Cal. 4th 34, 48, n.7 (2001) ("we caution that jury instructions, whether published or not, are not themselves the law, and are not authority to establish legal propositions or precedent. They should not be cited as authority for legal principles in appellate opinions.").  Here, the Court relies on precedent for the legal standard to apply in this case.

can assign to the claimant his cause of action for bad faith refusal to settle in exchange for a covenant not to enforce the judgment against the insured's personal assets).  While the cause of action for breach of the implied covenant of good faith and fair dealing is assignable, tort damages for emotional distress and punitive damages are not assignable as they are purely personal tort claims.  *Murphy v. Allstate Ins. Co*., 17 Cal. 3d 937, 942 (1976).  Therefore, Fernandez Lawson, as assignee, and Kepple, as an individual, may bring their claims for breach of the implied covenant of good faith and fair dealing.

However, less apparent is whether Fernandez-Lawson can proceed as a judgment creditor in this case under California Insurance Code section 11580(b)(2).[9]  Therefore, because the parties have not addressed the legal basis for her to proceed as a judgment creditor, the Court also declines to address it.  As such, the Court DENIES Plaintiffs and Defendant's motions for summary judgment on the breach of the implied duty of good faith and fair dealing by Fernandez-Lawson as judgment creditor.

## 1.  Legal Standard on Breach of the Implied Duty of Good Faith and Fair Dealing

In California, "there is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement," and this principle is "applicable to policies of insurance."  *Comunale*, 50 Cal. 2d at 658.  This includes, among other things, an insurer's duty to accept a reasonable settlement offer.  *See Johansen*, 15 Cal. 3d at 14-15 (citing *Comunale*, 50 Cal. 2d at 659); *Crisci v. Sec. Ins. Co. of New Haven, Conn.*, 66 Cal. 2d 425, 430 (1967) ("duty to accept reasonable settlements" is implied in the covenant of good faith and fair dealing).

---

[9] California Insurance Code § 11580 provides that every liability insurance policy issued in California must include "[a] provision that whenever judgment is secured against the insured . . . in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy and subject to its terms and limitations, by such judgment creditor to recover on the judgment." Cal. Ins. Code § 11580(b)(2).

A breach of the implied duty to settle claims has two elements.  *Graciano v. Mercury Gen. Corp.,* 231 Cal. App. 4th 414, 425-26 (2014).  First, the third party must have "made a reasonable offer to settle the claims against the insured for an amount within the policy limits."[10]  *Id.* at 425.  Second, the insurer must have "unreasonably failed to accept an otherwise reasonable offer within the time specified by the third party for acceptance."  *Id.* at 426.  In this case, only the second element, whether NGIC failed to accept a reasonable offer, is disputed.[11]

Under California law, "[t]he implied covenant of good faith and fair dealing imposes a duty on the insurer to settle a claim against its insured within policy limits whenever there is a substantial likelihood of a recovery in excess of those limits." *Johansen*, 15 Cal. 3d at 14-15 (citing *Comunale,* 50 Cal. 2d at 658); *Comunale*, 50 Cal. 2d at 659 ("When there is great risk of a recovery beyond the policy limits so that the most reasonable manner of disposing of the claim is a settlement which can be made within those limits, a consideration in good faith of the insured's interest requires the insurer to settle the claim.").  The "only permissible" inquiry on whether an insurer's rejection of a settlement offer is "reasonable" is "whether, in light of the victim's injuries and the probable liability of the insured, the ultimate judgment is likely to exceed the amount of the settlement offer." *Johansen*, 15 Cal. 3d at 16.  "Such factors as the limits imposed by the policy, a desire to reduce the amount of future settlements, or a belief that the policy does not provide coverage, should not affect a decision as to whether the settlement offer in question is a reasonable one." *Id.*

---

[10] The first element is satisfied if "(1) its terms are clear enough to have created an enforceable contract resolving all claims had it been accepted by the insurer, [ ] (2) all of the third party claimants have joined in the demand [ ], (3) it provides for a complete release of all insureds [ ], and (4) the time provided for acceptance did not deprive the insurer of an adequate opportunity to investigate and evaluate its insured's exposure. [ ]" *Graciano,* 231 Cal. App. 4th at 425.

[11] In one sentence, Defendant opposes Plaintiffs' argument that Fernandez-Lawson made a reasonable offer to settle but provides no meaningful argument; instead, it focuses on the reasonableness of its decision to reject the policy limits demand.  (Dkt. No. 25 at 16.)

1    The implied covenant of good faith and fair dealing also includes the duty to

2    investigate. *Egan v. Mut. of Omaha Inc. Co*., 24 Cal. 3d 809, 817 (1979) (an "insurer

3    may breach the covenant of good faith and fair dealing when it fails to properly

4    investigate its insured's claim."); *Frommoethelydo v. Fire Ins. Exchange*, 42 Cal. 3d 208,

5    214-15 (1986) ("Among the most critical factors bearing on the insurer's good faith is the

6    adequacy of its investigation of the claim."); *Shade Food, Inc. v. Innovative Prods. Sales*

7    *& Mktg., Inc.*, 78 Cal. App. 4th 847, 879 (2000) ("Among the most critical factors

8    bearing on the insurer's good faith is the adequacy of its investigation of the claim.").

9    "[I]t is essential that an insurer fully inquire into possible bases that might support the

10   insured's claim." *Egan,* 24 Cal. 3d at 819; *Jordan v. Allstate Ins. Co*., 148 Cal. App. 4th

11   1062, 1073 (2007) ("an insurer owes a duty to its insured to investigate *all* of the possible

12   bases of an insured's claim") (emphasis in original).  An insurer's investigation is

13   unreasonable if the insurer "fails to consider, or seek to discover, evidence relevant to the

14   issues of liability and damages." *Shade Food, Inc.,* 78 Cal. App. 4th at 880.  As such,

15   "[a]n insurance company may not ignore evidence which supports coverage.  If it does

16   so, it acts unreasonably towards its insured and breaches the covenant of good faith and

17   fair dealing." *Mariscal v. Old Republic Life Ins. Co*., 42 Cal. App. 4th 1617, 1624 (1996)

18   ("insurer may not just focus on those facts which justify denial of the claim" and must

19   "thoroughly investigate the circumstances").  Consequently, if the insurer did not

20   undertake an adequate investigation, "the insurer is charged with constructive notice of

21   facts that it might have learned if it had pursued the requisite investigation." *KPFF, Inc.*

22   *v. Cal. Union Ins. Co*., 56 Cal. App. 4th 963, 973 (1997) (citations omitted).  It is the

23   insurer who has the burden to investigate and seek information relevant to the claim.

24   *Hughes v. Blue Cross of N. Cal*., 215 Cal. App. 3d 832, 846 (1989).

25   Under this duty, the insurer "must take into account the interest of the insured and

26   give it at least as much consideration as it does to its own interest." *Comunale,* 50 Cal.

27   2d at 659 (citation omitted).  "This obligation requires that the insurer give the offer its

28   intelligent and informed consideration; that the insurer advise the insured of any

settlement offers, together with the results of its investigations; and that the insurer give equal consideration to the interests of its insured." *Cain v. State Farm Mutual Auto. Ins. Co.*, 47 Cal. App. 3d 783, 791 (1975); *Walbrook Ins. Co. v. Liberty Mut. Ins. Co.*, 5 Cal. App. 4th 1445, 1457 (1992) (quoting *Martin v. Hartford Acc. & Indem. Co.*, 228 Cal. App. 2d 178, 183 (1964) ("While negligence alone is not sufficient to constitute bad faith, an insurer must make an "informed decision" and include "the duty to give intelligent consideration to an offer of settlement, with reasonable investigation and a decision by persons reasonably qualified to decide upon the risks involved.")).

A breach of any of these obligations coupled with a refusal to settle within policy limits may render an insurer liable for any judgment against its insured, including any portion in excess of the policy limits." *Anguiano v. Allstate Ins. Co.*, 209 F.3d 1167, 1169 (9th Cir. 2000) (citing *Cain,* 47 Cal. App. 3d at 791); *Comunale,* 50 Cal. 2d at 660 ("An insurer who denies coverage does so at its own risk and although its position may not have been entirely groundless, if the denial is found to be wrongful it is liable for the full amount which will compensate the insured for all the detriment caused by the insurer's breach of the express and implied obligations of the contract."); *Crisci*, 66 Cal. 2d at 430-31 ("In view of such expectation an insurer should not be permitted to further its own interests by rejecting opportunities to settle within the policy limits unless it is also willing to absorb losses which may result from its failure to settle.").

The determination of whether an insurer's conduct rises to the level of bad faith must be determined based on the "totality of the circumstances in which the insurer's disputed actions occurred." *Walbrook Ins. Co.*, 5 Cal. App. 4th at 1455-56 ("The relative weight of these factors-which are nebulous and imprecise by their very nature-will, of course, vary from case to case."). As such, the circumstances surrounding the insurer's decision to settle are "wide-ranging" and include "motive, knowledge, experience, and the ability to prophesy." *Camelot by the Bay Condominium Owners' Ass'n, Inc. v. Scottsdale Ins. Co.*, 27 Cal. App. 4th 33, 48 (1994) (citing *Walbrook Ins. Co.*, 5 Cal. App. 4th at 1456). Further, "the reasonableness of the insurer's decisions and actions must be

evaluated as of the time that they were made; the evaluation cannot fairly be made in the light of subsequent events that may provide evidence of the insurer's errors." *Chateau Chamberay Homeowners Ass'n. v. Associated Int'l Ins. Co*., 90 Cal. App. 4th 335, 347 (2001). "While an insurer's conduct need not rise to the level of actual dishonesty, fraud, or concealment to constitute bad faith, an insurer's conduct must nevertheless be prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act." *McGranahan v. GEICO Indem. Co*. --F. Supp. 3d--, 2024 WL 413461, at *6 (C.D. Cal. Jan. 31, 2024) (citing *McDaniel v. Gov't Emps. Ins. Co*., 681 Fed. App'x 614, 615-16 (9th Cir. 2017) (internal quotation marks and citation omitted)).

"[T]he reasonableness of a rejected settlement offer is often an issue of fact to be determined by the jury." *Samson v. Transamerica Ins. Co*., 30 Cal. 3d 220, 243 (1981) (citations omitted). However, "[t]he question becomes one of law only when, because there are no conflicting inferences, reasonable minds could not differ." *Walbrook Ins. Co.,* 5 Cal. App. 4th at 1454-55 (citations omitted).

**2.    Whether Considering the Totality of the Circumstances, NGIC Unreasonably Failed to Accept Fernandez-Lawson's Settlement Offer for Policy Limits**

The facts in this case are largely undisputed. The parties recognize there were three separate policy limits settlement demands by Fernandez-Lawson but the ultimate question is whether, as of April 9, 2018, when the third policy limits demand was sent, NGIC unreasonably rejected Fernandez-Lawson's offer to settle for the $15,000 policy limit.

Defendant argues it was not required to accept a settlement offer based on the "possibility" of a judgment exceeding policy limits. (Dkt. No. 25 at 17-18.) Plaintiffs maintain that the documents presented to NGIC, as of April 9, 2018, showed it was likely that a judgment against Kepple would exceed the $15,000 policy limit. (Dkt. No. 18-1.)

Within two days of the accident, NGIC acknowledged that there was coverage and Kepple was 100% at fault so the question, pending before the Court, is whether

considering Fernandez-Law's injuries at the time of the April 9, 2018 settlement offer, a judgment against Kepple would likely exceed $15,000.  *See Johansen*, 15 Cal. 3d at 16 ("in light of the victim's injuries and the probable liability of the insured, the ultimate judgment is likely to exceed the amount of the settlement offer").

### a.   Past and Future Medical Expenses

It is not disputed that the calculation of past and future medical expenses are considered as part of damages to bodily injury under the policy.  In assessing a claim for future medical expenses, Bradley Gibbs, NGIC's regional claims manager, testified that NGIC takes into consideration future medical treatment if necessary and medically supported, but will not take into consideration "wild assumptions" that "every claim is going to take its worst possible path of injury and treatment."  (*See* Dkt. No. 25-5, Martin Decl., Ex. 29, Gibbs Depo. at 49:15-50:5; 51:8-10.[12])

As of April 9, 2018, NGIC accepted Fernandez-Lawson's past medical expenses which are supported by the invoices of $4,658.16 from AMR; $2,064.90[13] for the ER visit on October 11, 2017; and co-payments of $210.00 for a total of $6,933.06.[14]  (Dkt. No. 18-5, Calhoon Decl., Ex. 13; *id.*, Ex. 19.)

As to future medical care, while NGIC acknowledges that the medical records recommended that Fernandez-Lawson undergo PT 1-2 times a week for 6-8 weeks for about 16 sessions, it claims there was little likelihood that she would complete treatment because she did not attend PT until March 2018, five months after the accident.  (Dkt. No. 19 at 19.)  Moreover, even if it did consider the PT visits, the additional $640.00 in

---

[12] Deposition page numbers are based on the page numbers on the transcript.

[13] While the ER visit invoice charge was $2,064.90, Fernandez-Lawson was only responsible for $100. NGIC has acknowledged that in assessing the damages, it includes the reasonable and customary costs, which is the amount billed, not the owed amount.  (Dkt. No. 24-3, Calhoon Decl., Ex. 57, Tuck Depo. at 171:3-8.)

[14] As noted above, NGIC's calculation is off by $90 because the AMR invoice was incorrected listed as $4,568.16 when the actual invoice was $4,658.16.  Therefore, NGIC relied on a total of $6843.06 for the total amount of past medical expenses.  Ultimately, the $90 difference does not affect the Court's conclusion.

co-pays based on a $40.00 co-pay would not exceed her medical bills beyond $8,000. (*Id.* at 19-20.)  Plaintiffs respond that NGIC knew Fernandez-Lawson had been referred to PT, costing around $150 per visit, and also knew a CT scan had been ordered by Dr. Merritt, costing around $2000.00.  (Dkt. No. 24 at 21-22.)  They further argue that NGIC improperly uses the co-pay for its calculation, when, in fact, NGIC pays the reasonable and customary rate or the amount charged for medical care.  (*Id.* at 22.)  Finally, they contend NGIC failed to investigate her need for future medical care based on her medical records, her reported symptoms and her attorney's reports.  (Dkt. No. 18-1 at 20-21.)

Based on the medical records provided to NGIC, Fernandez-Lawson's second policy limits demand included an order for a CT scan of the brain with/without contrast, dated March 26, 2018.  (Dkt. No. 18-5, Calhoon Decl., Ex. 19 at 182.)  Yet, Tuck's claim file does not mention the CT scan order and NGIC does not explain why it was not considered as a future medical expense.  (*See* Dkt. No. 19-4, Tuck Decl., Ex. 2 at 112-14.)  As to the cost of medical treatment, Tuck testified that in assessing a claim, NGIC includes the reasonable and customary costs, which is the billed amount, not the owed amount.  (Dkt. No. 24-3, Calhoon Decl., Ex. 57, Tuck Depo. at 171:3-8.)  As such, the record includes testimony that the reasonable and customary cost for a CT scan of the brain is around $2,000.00.  (Dkt. No. 18-5, Calhoon Decl., Ex. 22, Tontz Expert Report at 229.)

The second policy limits demand also included a referral to PT for "whiplash and low back" from Dr. Merritt.  (Dkt. No. 18-5, Calhoon Decl., Ex. 19 at 184.)  Attached were two separate PT evaluations, dated March 22, 2018: one for her "lumbar spine and sacroiliac" and one for "cervical/thoracic" and each indicated her therapy plan was "up to 1-2x/week for up to 6-8 weeks."  (Dkt. No. 18-5, Calhoon Decl., Ex. 19 at 189, 193.)

Also included were future PT appointments showing 2 visits for each day[15] on March 27, 2018 and April 3, 2018.  (*Id.* at 183.)  Again, NGIC does not provide any reason why it did not include future physical therapy expenses and its reason that it did not think that she would complete treatment is not supported by any evidence.  The only comment Tuck made regarding PT in the claim file was listing it under "mitigators" because there was a gap in treatment.  Tuck made no evaluation as to the cost of future expected PT visits.  The record includes testimony that the reasonable and customary cost of physical therapy is about $150 per visit.  (Dkt. No. 18-5, Calhoon Decl., Ex. 22, Tontz Expert Report at 229; Dkt. No. 24-3, Calhoon Decl., Ex. 59, Gibbs Depo. at 114:6-20 (testifying PT visit to be about $100-$150 per visit).)  As such, assessing a minimum visit of going once a week for two separate sessions for 6 weeks (12x) would be about $1,800.00.  Therefore, as of April 9, 2018, past and future medical costs documented in the medical records totaled at least $10,733.06.

Further, to the extent that NGIC had questions as to why Fernandez-Lawson did not seek treatment for five months, or that it was not likely she would complete treatment, it had a duty to investigate.  *See Hughes*, 215 Cal. App. 3d at 846 (insurer has the burden to investigate).  Tuck explained that she listed PT as a mitigating factor because Fernandez-Lawson waited five months for treatment and even if you do not have any money, if you are in that much pain, you get treatment.  (Dkt. No. 18-5, Calhoon Decl., Ex. 16, Calhoon Decl., Tuck Depo. at 241:6-17; 243:4-19.)  Gibbs also testified that a gap in treatment is a factor in assessing the timeline and not conclusive of anything, by itself.  (Dkt. No. 25-5, Martin Decl., Ex. 29, Gibbs Depo. at 101:25-103:9.)  He further stated that it was unusual to have someone not working and also not seeking treatment and raises questions as to "What's going on?" and "Why aren't they treating?" and "Why

---

[15] Based on the appointment times of her scheduled PT session, the Court assumes she attended back to back physical therapy sessions for her lumbar/sacroiliac issues and a separate visit for cervical/thoracic issues.  (Dkt. No. 18-5, Calhoon Decl., Ex. 19 at 183.)  Each would likely require a separate fee.

aren't they working?" (*Id.* at 127:5-128:1.)  Therefore, because questions arose as to the delayed PT treatment, NGIC had a duty to investigate why Fernandez-Lawson did not get treatment from November 2017 to March 2018, and instead, rejected any expenses for future PT visits.  If appears that Tuck, when evaluating the claim, misunderstood her duty to investigate and improperly placed the burden to prove the claim solely on the insured. (*See* Dkt. No. 18-5, Ex. 16, Calhoon Decl., Tuck Depo. at 168:4-169:6 ("I just evaluate it based on what they sent over to me. At the end of the day, they're proving their claim to me, so they should have supplied all the documents that was needed for me to evaluate this claim.").)

Based on the medical documents in NGIC's possession as of April 9, 2018, NGIC does not provide an explanation why it ignored evidence of future medical expenses of a CT scan and PT visits.  *See Mariscal*, 42 Cal. App. 4th at 1624 (insurer acts unreasonably when it ignores evidence that supports coverage).  The record reveals that NGIC simply ignored them.  Further, NGIC failed to investigate its own questions regarding Fernandez-Lawson's delay in seeking PT treatment, and instead, failed to account for any future PT visits.[16]  Therefore, NGIC breached its implied duty of good faith and fair dealing in not considering future medical expenses documented in the second policy limits demand.

### b.   Past and Future Wage Loss

In support of its position of $0 calculation for wage loss, Defendant argues that no physician indicated Fernandez-Lawson was unable to work, no records were provided

_____

[16] Both parties dispute whether NGIC should have known Fernandez-Lawson suffered from radiculopathy or nerve root compression based on the medical records, her complaints of severe pain and her attorney's repeated comments about the severity of her pain which she claimed was likely due to nerve impingement.  (*See* Dkt. No. 18-1 at 20-21; Dkt. No. 24 at 19-21; Dkt. No. 25 at 19-20.)  The Court need not address whether Tuck understood the significance of the medical records and whether reported symptoms of pain were sufficient to put NGIC on notice of a more serious condition since the Court grants summary judgment based on the failure to include certain damages in NGIC's determination of whether it would likely be subject to a judgment that exceeds $15,000.

such as appointment ledgers, profit-loss statements, or other documentation concerning her lost wages, and the income tax forms showed decreasing business income for the prior three years from 2014-16 and no documentation established her income from January through October 2017.  (Dkt. No. 19 at 19; Dkt. No. 25 at 14.)  In response, Plaintiffs maintains that NGIC was in possession of information relating to Fernandez-Lawson's dog grooming business as she told NGIC that she groomed about 3-6 dogs per day and provided her rates and said she lost $200 on October 13, 2018.  (Dkt. No. 18-1 at 21-23; Dkt. No. 24 at 23-24.)  Moreover, NGIC was aware that she had not worked for six months since the accident, had her tax returns but failed to include any wage loss, past or future.  (Dkt. No. 18-1 at 21-23; Dkt. No. 24 at 23-24.)

Tuck testified that the insurer has a duty to provide compensation for past and future wage loss, for past and future pain and suffering as long as they are supported by documentation.  (Dkt. No. 24-3, Calhoon Decl., Ex. 57, Tuck Depo. at 77:11-14; 79:1-8.)  Gibbs similarly testified that NGIC takes into account future damages, including future economic, and future pain and suffering, if it can draw those conclusions from the medical records at the time.  (Dkt. No. 25-5, Martin Decl., Ex. 29, Gibbs Depo. at 50:6-51:7.)

Here, NGIC assessed $0 for wage loss indicating that there was no documentation despite recognizing $200 of lost wages on October 13, 2018.  (Dkt. No. 19-4, Tuck Decl., Ex. 2 at 112-13.)  However, NGIC knew Fernandez-Lawson had not been working since the accident when Attorney Fell repeatedly informed NGIC that Fernandez-Lawson was unable to work since the accident, (Dkt. No. 18-5, Calhoon Decl., Ex. 13 at 17; Dkt. No. 18-6, Calhoon Decl., Ex. 24 at 2; *id.*, Ex. 27 at 78), and the PT evaluations also indicated that Fernandez-Lawson was off work due to her injuries. (Dkt. No. 18-5, Calhoon Decl., Ex. 19 at 187, 191).

While NGIC does not dispute that it knew Fernandez-Lawson had not been working since the accident, it maintains there was no documentation to support her wage loss.  NGIC argues that it never received a doctor's note indicating that she could not

work and that Fernandez-Lawson did not provide any documentation such as appointment ledgers or profit-loss statements; yet, NGIC never inquired about those documents or investigated whether Fernandez-Lawson could or could not work. Moreover, NGIC fails to explain why Tuck did not request these documents when Attorney Fell asked what documentation was needed to support the wage loss in their conversation of March 20, 2018.  Instead, Tuck responded that she would only need three years of tax returns.  (Dkt. No. 19-4, Tuck Decl., Ex. 2 at 115; Dkt. No. 18-3, Fell Decl. ¶ 7.)  In that conversation, Tuck also mentioned that if wage loss were accounted for, it would raise a policy limits issue.  (Dkt. No. 19-4, Tuck Decl., Ex. 2 at 115; Dkt. No. 18-3, Fell Decl. ¶ 7.)

On April 9, 2018, NGIC received the prior three years of Fernandez-Lawson's tax returns that provided gross income specific to her dog grooming business.  (Dkt. No. 18-6, Calhoon Decl., Ex. 24.)  Oddly, Tuck's claim file does not mention the receipt of the three years of tax returns submitted by Attorney Fell in the third policy limits demand of April 9, 2018.  (*See* Dkt. No. 19-4, Tuck Decl., Ex. 2 at 112.)  Moreover, in their papers, NGIC does not explain why the tax returns were never considered.  While Tuck acknowledged she received the tax returns, she testified she did not know why she did not offer any amounts for wage loss.  (Dkt. No. 18-5, Calhoon Decl., Ex. 16, Tuck Depo. at 261:3-16.)  Instead, on April 11, 2018, in the claim file, Tuck wrote that she received additional records but evaluates the PT records that had already been received in a prior submission.  (Dkt. No. 19-4, Tuck Decl., Ex. 2 at 112.)

Considering the lowest gross income in 2016 of $9,355, which amounts to $779.60 per month, and the six months Fernandez-Lawson had not worked from October 11, 2018 to April 9, 2018, her minimum estimated lost income for six months was about $4,677.00.

Again, by assessing $0 for past and future wage loss, NGIC ignored evidence that supported past wage losses and also failed to consider future wage losses.  *See Comunale*, 50 Cal. 2d at 659 (in discharging this duty, the insurer "'may not ignore evidence which

supports coverage.").  To the extent that NGIC had questions about her wage loss, it should have investigated by asking for documentation from a physician that she is unable to work and that she provide appointment ledgers and/or profit-loss statements to support her lost wages.  Instead, even though Tuck asked for three years of tax returns, she wholly failed to consider them in her evaluation of the claim. Therefore, the Court concludes that NGIC's failure to consider any past or future wage loss in its assessment was a breach of the implied covenant of good faith and fair dealing.

In sum, adding the $10,733.06, the minimum amount of past and future medical expenses supported by the documentation, and $4,677.00, the minimum of past wage loss supported by the documentation, the total amount in damages was at a minimum $15,410.00, an amount above the $15,000 policy limits.  Further, this amount fails to consider any future wage loss, future medical care, and past and future pain and suffering.  (Dkt. No. 18-5, Calhoon Decl., Ex. 16, Tuck Depo. at 260:14-261:25 (Tuck testified she offered $11,800 [on April 11, 2018] and that she did not assess amounts for future medical care, future pain and suffering and wage loss).)

Therefore, as of April 9, 2018, the Court finds, as a matter of law, that only one conclusion can be drawn from the evidence, that NGIC had information available to it that a judgment against Kepple would likely exceed $15,000.  Consequently, the Court concludes that NGIC unreasonably rejected the $15,000 policy limits demand of April 9, 2018 and breached the covenant of good faith and fair dealing.[17]  *See Marsango v. Auto.*

---

[17] In opposition to Plaintiffs' motion, Defendant also argues that because there is a genuine dispute as to the extent of damages based on evidence known at the time of its evaluation of the claim, it is not liable for incorrectly predicting the judgment. (Dkt. No. 265 at 25-26.)  Plaintiffs disagree. (Dkt. No. 27 at 11.)  Under the genuine dispute doctrine, "an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract." *Wilson v. 21st Century Ins. Co*., 42 Cal. 4th 713, 723 (2007).  While the doctrine originally applied to legal issues of policy interpretation, courts have applied the doctrine to factual disputes.  *See Chateau Chamberay Homeowners Ass'n,* 90 Cal. App. 4th at 348 ("we see no reason why the genuine dispute doctrine should be limited to legal issues").  "The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim.

*Club of S. Cal.*, 1 Cal. App. 3d 688, 696 (1969) ("Whether an insurers' failure to settle within the policy limits constitutes bad faith to its insured is a question of fact to be determined by the jury . . . unless the evidence is such that only one conclusion may reasonably be drawn from it.").

### c.   Failure to Communicate with Kepple about Implications of the Policy Limits Demand[18]

In their motion, Plaintiffs argue summary judgment should be granted on breach of the duty of good faith and fair dealing because NGIC breached it duty to communicate to Kepple[19] concerning the implications of the policy limits demands such as the seriousness or effects of a judgment against him such that he could liable for all amounts in excess of the policy limits, failed to advise him of NGIC's assessment or evaluation of the claim and provide him an opportunity to contribute his own funds to effect a settlement.  (Dkt. No. 18-1 at 29-30.)  NGIC responds that Plaintiffs' allegations amount to negligence, not bad faith, and there is nothing in the record that would have affected the potential liability of an excess judgment since it properly evaluated all the evidence provided.  (Dkt. No. 25 at 23.)

In evaluating a settlement offer, the insurer has a duty to not only consider its own interests but must consider the interests of the insured.  *See Comunale*, 50 Cal. 2d at 659; *Davy v. Pub. Nat'l Ins. Co*., 181 Cal. App. 2d 387, 395 (1960) ("The decision on such a matter must be based not only on the probable benefit or detriment ensuing to the insurer, but also and equally upon a consideration of the probable benefit or detriment ensuing to

---

A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds." *Wilson*, 42 Cal. 4th at 723-24.  Here, to the extent the genuine dispute doctrine applies in this case, it is not applicable as NGIC did not act reasonably in assessing the claim.

[18] This issue was only raised in Plaintiffs' motion for summary judgment.

[19] Because Ray Kepple was the named insured on the policy, the Court looks at the communications to Ray Kepple and Trenton Kepple, an additional insured.  Neither party has provided legal authority that the communications must be directed to solely to the driver of the vehicle covered by the insurance rather than the named insured.

the insured.").  As such, the "covenant to exercise good faith imposes upon the insurer the duty to communicate to the insured the results of any investigation indicating liability in excess of policy limits, and any offers of settlement which have been made, so that he may take proper steps to protect his own interest." *Ivy v. Pacific Auto. Ins. Co.*, 156 Cal. App. 2d 652, 660 (1958); *Martin v. Hartford Accident & Indem. Co.*, 228 Cal. App. 2d 178, 183-84 (1964) ("Insurer had the duty to communicate to him the results of any investigation indicating liability in excess of policy limits, and any offers of settlement which were made, so that he might take proper steps to protect his own interest."). Ultimately, the question is whether the insured was given the opportunity to protect his own interests.  *Davy*, 181 Cal. App. 2d at 399 ("Regardless of who may have communicated the information to him, [insured] was fully informed in sufficient time to protect his interests.").

In this case, on February 15, 2018, NGIC sent Ray Kepple, the insured, a letter advising him of the first time limit demand, that it "was working to bring this matter to a close", "will address all concerns within the specified time period", and attached a copy of the demand letter.  (Dkt. No. 25-5, Tuck Decl., Ex. 28; Dkt. No. 19-4, Tuck Decl., Ex. 2 at 118.)  Then, on April 13, 2018, after Fernandez-Lawson rejected NGIC's final counteroffer, NGIC advised Ray Kepple that it was attempting to resolve the claim but "it is possible that a lawsuit may be filed against you."  (Dkt. No. 18-6, Calhoon Decl., Ex. 29; *see also* Dkt. No. 19-4, Tuck Decl., Ex. 2 at 111.)  It also directed him to notify NGIC immediately if he is served with a complaint or any legal papers and that if a complaint was filed, it would retain an attorney to represent him at no cost to Kepple.  (Dkt. No. 18-6, Calhoon Decl., Ex. 29.)

On July 6, 2018, NGIC informed Ray Kepple that the claim would likely exceed the policy limits, stating "Our investigation leads us to believe that the claims for injuries and/or damages could exceed the bodily injury and/or property damage limits of liability under this policy.  While every attempt will be made to resolve all claims against you . . . please understand that [NGIC] will not be responsible for any award, judgment or verdict

against you in excess of the limits of liability as set forth in your policy and any such excess damages will be your personal responsibility." (Dkt. No. 18-6, Calhoon Decl., Ex. 40.)  Further, NGIC stated that "You should also be aware that if any time during the handling of the claims arising out of this matter, we advise you that we have offered the full available policy limits and that any one or more claimants advises us that that is not sufficient to compensate them and they are demanding more than your limits, that you have the right to personally contribute money above your limits to effectuate a settlement of that individual claim that is being made against you.  We will let you know should this situation occur." (*Id*.)  On December 6, 2018, NGIC sent a letter to Ray Kepple indicating NGIC received the complaint and summons and reiterated the policy coverage. (Dkt. No. 24-3, Calhoon Decl., Ex. 64 at 79.)  Finally, on January 11, 2022, NGIC sent a letter Trenton Kepple stating, "Our investigation leads us to believe that the claim for damages or injuries will likely exceed the limits of liability under this policy. While every attempt will be made to resolve all claims against you, please understand that [NGIC] will not be responsible for any award, judgment or verdict against you in excess of the limits of liability as set forth in your policy and all such excess damages will be your personal responsibility." (Dkt. No. 24-3, Calhoon Decl., Ex. 64 at 77.)  "As previously stated, we have offered the full available policy limits. Angie Fernandez-Lawson has advised through her attorneys that same is insufficient to compensate her. As she is demanding more than your limits, you have the right to personally contribute money above your limits to effectuate a settlement of that individual claim which is being made against you." (*Id*. at 78.)

NGIC informed Ray Kepple of the first policy limits demand, but not the second or third policy limit demands.  However, the second and third policy limits demands along with their attachments were crucial in providing the documentation showing that Fernandez-Lawson's potential damages would likely exceed $15,000.  Only after Fernandez-Lawson rejected the last counteroffer by NGIC and indicated she would proceed with litigation did NGIC inform Ray Kepple, on July 6, 2018 that the claim

could exceed the policy limits and that he would be responsible for any award in excess of the limits of liability and that he had the right to personally contribute money to effectuate a settlement if the claimant sought more than the policy limits.

Therefore, by July 6, 2018, it was too late for Kepple "to exercise any influence over [NGIC's] decision". *See Anguiano*, 209 F.3d at 1170 (reversing summary judgment in favor of insurer for breach of the covenant of good faith and fair dealing for insurer's failure to inform the insured about the settlement offers) (citing *Martin*, 228 Cal. App. 2d at 184 ("[A]n insured who is kept informed may have further information to give to the carrier; he may use powers of persuasion upon the carrier to increase its offer; he may engage counsel; he may have other courses of action open to him.")). Therefore, the Court finds, as a matter of law, that NGIC breached the covenant of good faith and fair dealing by failing to communicate the second and third policy limits demand to Kepple.

In conclusion, the Court GRANTS Plaintiffs' motion for partial summary judgment on the breach of the implied duty of good faith and fair dealing by Fernandez-Lawson, as assignee, and DENIES Defendant's motion for partial summary judgment the same claim by Fernandez-Lawson, as assignee.

## C.    Breach of Contract-Second and Fifth Claims

Defendant seeks summary judgment on the second and fifth causes of action for breach of contract claim by Fernandez-Lawson, as assignee and judgment creditor, arguing Plaintiffs have not identified a breach of any express provisions of the insurance contract. (Dkt. No. 19 at 16-17.) In response, Plaintiffs argue that the duty of reasonable settlement is a policy benefit to the insured and breach of that implied-in-law duty is a breach of the insurance contract. (Dkt. No. 24 at 38.)

As noted above, the Court declines to address Defendant's motion as it concerns Fernandez-Lawson, as judgment creditor, for failing to address the legal basis for her to proceed as a judgment creditor, and DENIES Defendant's motion on this basis. As to Fernandez-Lawson's breach of contract claim, as assignee of Kepple, she summarily alleges that Defendant breached the terms of the insurance policy by failing to provide

benefits owed to Fernandez-Lawson.  (Dkt. No. 1, Compl. ¶¶ 60-63.)  In their opposition, Plaintiffs admit that the breach of contract is based on NGIC's failure to accept a reasonable settlement offer and explain they presented two alternative claims for recovery.  (Dkt. No. 24 at 38-39.)  Because the Court has granted summary judgment in favor of Plaintiff Fernandez-Lawson, as assignee, on the breach of the implied covenant of good faith and fair dealing, the Court GRANTS Defendants' motion for summary judgment the breach of contract claim premised on the same claim as duplicative.  *See e.g., Keshish v. Allstate Ins. Co.,* 959 F. Supp. 2d 1226, 1229 & n.5 (C.D. Cal. 2013) (noting a claim for breach of the duty of good faith and fair dealing was duplicative of breach of contract claim); *Spradlin,* 2019 WL 6481304, at *15 (granting summary judgment as to breach of contract claim duplicative of bad faith claim).  Accordingly, the Court GRANTS Defendant's motion for summary judgment on the second claim for breach of contract.

**D.     Direct Action for Recovery-Third Claim**

On the third claim, Defendant summarily argues, in one paragraph, that the evidence, as of April 11, 2018, did not establish that it was substantially likely that Fernandez-Lawson's claim would exceed the $15,000 policy limits and did not "open" the policy limits.   (Dkt. No. 19 at 22-23.)  Plaintiffs, similarly, respond in one sentence, merely referencing its prior analysis, arguing that the claim is not subject to partial summary judgment. (Dkt. No. 24 at 27.)

The third cause of action alleges a claim for direct action for recovery of judgment by Fernandez-Lawson under California Insurance Code section 11580. (Dkt. No. 1, Compl. ¶¶ 65-67.)  Fernandez-Lawson, as judgment creditor of Kepple, alleges she became a third-party beneficiary of the insurance policy and is entitled to recover judgment from the underlying state court action plus interest under California Insurance Code § 11580.  (*Id.*)  Neither party provides any analyses on California Insurance Code section 11580 and its application to the facts of this case.  Therefore, because Defendant has not met its burden on summary judgment on this claim, the Court DENIES

Defendant's motion for summary judgment the third cause of action as legally and factually unsupported.

**E.     Punitive Damages**

Finally, Defendant moves for summary judgment on the claim for punitive damages arguing there is no evidence, let alone clear and convincing evidence, that NGIC's conduct constituted oppression, malice or fraud because it evaluated Fernandez-Lawson's claim, requested documents, reviewed the evidence, followed up and requested additional documents.  (Dkt. No. 19 at 23-25.)  Plaintiffs oppose the motion arguing that, at summary judgment, Plaintiff need not prove by clear and convincing evidence of oppression, fraud or malice but that is an issue for the trier of fact.  (Dkt. No. 24 at 34.)  Moreover, Plaintiffs contend that a jury could find that NGIC acted with malice or oppression when it rejected the settlement demand by offering to settlement in amount only $404 less than the $15,000 policy limits and intentionally misled Kepple and concealed material facts from him.  (*Id.* at 35-36.)

Kepple seeks punitive damages on his claim for sixth claim against NGIC for breach of the implied covenant of good faith and fair dealing.  (Dkt. No. 1, Compl. ¶¶ 77-82.)

A plaintiff is entitled to punitive damages "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a).  Malice is defined as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." *Id.* § 3294(c)(1).  Oppression "means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." *Id.* § 3294(c)(2).  "Fraud means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." *Id.* § 3294(c)(3).

While Plaintiffs need not demonstrate punitive damages by "clear and convincing" evidence at summary judgment, "where the plaintiff's ultimate burden of proof will be by clear and convincing evidence, the higher standard of proof must be taken into account in ruling on a motion for summary judgment or summary adjudication, since if a plaintiff is to prevail on a claim for punitive damages, it will be necessary that the evidence presented meet the higher evidentiary standard." *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1053 (2009) (citing *Basich v. Allstate Ins. Co*., 87 Cal. App. 4th 1112, 1121 (2001) ("If the plaintiff is going to prevail on a punitive damages claim, he or she can only do so by establishing malice, oppression or fraud by clear and convincing evidence.  Thus, any evidence submitted in response to a motion for summary adjudication must necessarily meet that standard.")).

"Determinations related to assessment of punitive damages have traditionally been left to the discretion of the jury." *Egan*, 24 Cal. 3d at 821.  However, summary judgment on the issue of punitive damage is only proper "when no reasonable jury could find the plaintiff's evidence to be clear and convincing proof of malice, fraud, or oppression." *Hoch v. Allied–Signal, Inc*., 24 Cal. App. 4th 48, 60-61 (1994).  "To find the requisite intent for an award of punitive damages, it is necessary to search beyond the facts of [un]reasonable response to those adducing motive and intent. There must be substantial evidence of an intent to vex, injure and annoy, a conscious disregard of plaintiff's rights, before punitive damages may be awarded." *Fleming v. Safeco Ins. Co*., 160 Cal. App. 3d 31, 45 (1984) ("bad faith on the one hand, and malice, oppression, or fraud on the other hand are not equivalents, and any attempt to compare them would amount to a comparison of apples and oranges.").

The Court concludes that Plaintiffs have raised a genuine issue of material fact that NGIC's conduct in misleading Kepple by concealing material facts from him during the policy limit demand offers could warrant punitive damages.  Particularly, on April 13, 2018, NGIC wrote Ray Kepple that it was attempting to resolve the claim and informed him a lawsuit may be filed against him.  However, in viewing the evidence in the light

most favorable to Plaintiffs, a jury could find the letter was misleading because Fernandez-Lawson had already rejected NGIC's counteroffer, dated April 12, 2018, and stated she would proceed to litigation "unhindered" by the policy limits; therefore, NGIC was not attempting to settle the claim.  Moreover, the claim file does not show any attempts to resolve the claim between April 13, 2018 and June 26, 2018, when Ray Kepple informed NGIC that Trenton Kepple was served with a complaint.  (Dkt. No. 19-4, Tuck Decl., Ex. 2 at 110-11.)  Further, Plaintiffs argue that a jury could find that NGIC's rejection of the $15,000 policy limits demand even though it assessed the full value range to be $14,596.04 on April 11, 2018 could be deemed as malice or oppression towards Kepple.  (Dkt. No. 24 at 35.)

In viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that there is a genuine issue of material fact as to whether NGIC's conduct constituted oppression, malice or fraud.  *See Hughes,* 215 Cal. App. 3d at 847 (upholding award of punitive damages where denial of insurance claim was "product of . . . fragmentary medical records, a cursory review of the records, . . . [a] disclaimer of any obligation to investigate, [and] the use of a standard . . . at variance with community standards").  Accordingly, the Court DENIES Defendant's motion for summary judgment on punitive damages.

## Conclusion

Based on the reasoning above, the Court GRANTS in part and DENIES in part Plaintiffs' motion for partial summary judgment.  Specifically, the Court GRANTS the motion on the on the first (Fernandez-Lawson as assignee), and sixth (Trenton Kepple as an individual) claims for breach of the implied covenant of good faith and fair dealing and DENIES the fourth claim for breach of the implied covenant of good faith and fair dealing sought by Fernandez-Lawson, as judgment creditor.

The Court also GRANTS in part and DENIES in part Defendant's motion for partial summary judgment.  Specifically, the Court DENIES the motion on the first, fourth, and sixth claims for breach of the implied covenant of good faith and fair dealing;

GRANTS Defendant's motion for summary judgment on the second claim for breach of contract by Fernandez-Lawson, as assignee, and DENIES summary judgment on the fifth claim for breach of contract by Fernandez-Lawson, as judgment creditor; the third claim for direct action for recovery of judgment by Fernandez-Lawson; and the claim for punitive damages.  The hearing date set on May 10, 2024 shall be **vacated**.

      IT IS SO ORDERED.

Dated:  May 7, 2024

Hon. Gonzalo P. Curiel
United States District Judge

23CV777-GPC(AHG)